IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF CHANEL D. & NOAH D.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF CHANEL D. & NOAH D.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

JERMAINE D., APPELLANT.

Filed September 6, 2022.  No. A-22-040.

Appeal from the Separate Juvenile Court of Douglas County: AMY N. SCHUCHMAN, Judge. Affirmed.

Anne E. Troia, P.C., L.L.O., for appellant.

Alexander Kelly, Deputy Douglas County Attorney, and Curtis Cook, Senior Certified Law Student, for appellee.

MOORE, RIEDMANN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Jermaine D. appeals from the Douglas County Separate Juvenile Court's order terminating his parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (4), and (6) (Reissue 2016). He argues that the juvenile court erred in finding that the evidence was sufficient to terminate his parental rights and that termination was in the best interests of his two minor children. For the reasons stated herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Jermaine D. and Kelly S. are the biological parents of daughters Chanel D., born in 2016, and Noah D., born in 2018. This appeal relates solely to the termination of Jermaine's rights. References to Kelly are limited to those necessary for context.

In May 2017, 6-month-old Chanel was removed from her parents' care following reports of domestic violence between Jermaine and Kelly and because a hair sample obtained from Chanel tested positive for amphetamine, methamphetamine, and THC. Following Chanel's removal from her parents' care, she was placed in a kinship foster home. That same month, the State filed an adjudication petition related to Jermaine which, as amended, alleged that Chanel came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) for the reasons that: (a) on or about April 12, 2017, a hair sample collected from Chanel tested positive for amphetamine, methamphetamine, and THC; (b) Jermaine's use of alcohol and/or controlled substances placed Chanel at risk for harm; (c) Jermaine engaged in domestic violence with Kelly; (d) on or about April 4, Jermaine was apprehended on charges of possession of methamphetamine and possession of drug paraphernalia; (e) Jermaine failed to provide Chanel with proper parental care, support, and/or supervision; and (f) due to those allegations, Chanel was at risk for harm. In December, Jermaine admitted to allegations that his use of alcohol and controlled substances placed Chanel at risk for harm and the State dismissed the remaining allegations. The juvenile court proceeded to a partial disposition wherein the court issued an order requiring Jermaine to abstain from possessing or ingesting alcohol and/or controlled substances, undergo random drug testing, and complete a co-occurring evaluation.

Noah was born in January 2018. In January, Noah was removed from her parents' care and upon her discharge from the hospital, was placed in a foster home. Additionally, the State filed an adjudication petition as to Jermaine alleging that (a) Jermaine had an active juvenile case where he failed to reunify with Chanel; (b) Jermaine's use of drugs and or controlled substances placed Noah at risk for harm; (c) Jermaine failed to provide proper parental care, support and/or supervision for Noah; (d) Jermaine failed to provide proper safe, stable and/or appropriate housing to Noah; and (e) due to those reasons, Noah was at risk for harm. In March, following a contested adjudication hearing, the juvenile court adjudicated Noah as a child within the meaning of § 43-247(3)(a).

During the majority of their time in foster care, the children were in separate foster placements. However, both children were returned to their parents on June 6, 2019. One day later, Noah was returned to her foster parent at Jermaine's request because "they couldn't handle her." Chanel remained in her parents' home until she was again removed on May 4, 2020, based upon reported concerns of domestic violence and concerns that Jermaine was using substances. Following Noah's return to foster care in June 2019 and Chanel's return to foster care in May 2020, neither child has been returned to their parents' care.

In April 2021, the State filed a motion for termination of Jermaine's parental rights to Chanel and Noah pursuant to § 43-292(2) (substantial and continuous or repeated neglect), (4) (unfitness which is seriously detrimental to health, morals, or well-being of the child), and (6) (reasonable efforts to preserve and reunify failed to correct conditions leading to adjudication).

## 2. TERMINATION HEARING

The termination hearing was held over 2 days in November and December 2021. During the termination hearing, the State adduced evidence from: Deborah Gray and Emily Hough, caseworkers; the children's foster parents; David Cote and Sarah Valentine, drug testing supervisors; Joaquin Guerrero, visitation worker; and McKenzie Parks, Chanel's therapist.

### (a) Caseworker Testimony

Gray testified that she was the caseworker assigned to the case from August 2019 to August 2020 and again from October 2020 to January 2021. Gray testified that during her time as the caseworker, Jermaine was ordered to undergo drug testing, complete a chemical dependency evaluation, complete a hair follicle test, participate in intensive outpatient treatment, maintain safe and stable housing, maintain a legal source of income, participate in supervised visitation, complete several assessments and evaluations including a parenting assessment, and complete further substance use evaluations. Gray stated that although Jermaine maintained housing and completed an initial substance abuse evaluation, his employment was inconsistent, he failed to complete hair follicle testing, and he was not compliant with drug testing. Further, Gray learned from Jermaine's probation officer that Jermaine was not compliant with drug testing through probation.

Hough, who was the ongoing caseworker from January 2021 through the termination hearing, testified that Jermaine complied with the court order which required him to maintain housing and that he completed a chemical dependency evaluation. However, he failed to comply with court orders requiring him to maintain employment other than his self-reported income source of selling plasma, failed to complete a hair follicle test, and failed to attend intensive outpatient treatment. Additionally, throughout the case, Jermaine admitted to using substances. Although Jermaine contacted Hough a month prior to the termination hearing requesting that she arrange for him to enter treatment, Hough informed him that the facility required an updated chemical dependency evaluation before he could be reconsidered for treatment.

Hough further testified that she had concerns relating to Jermaine's behavior after it was reported that Jermaine was at the foster parents' home acting irrationally, including knocking on the door early in the morning and yelling. When Hough asked Jermaine if such behavior was appropriate, he replied that "he didn't see anything wrong with what he was doing."

### (b) Drug Testing

Valentine testified that Jermaine had been referred to drug testing at her agency in November 2017 but had been discharged four times due to noncompliance. Cote testified that he was Jermaine's drug testing technician from July through November 2020. He stated that although Jermaine had previously been referred for drug testing from January to June 2020, Jermaine was discharged for noncompliance.

### (c) Supervised Visitation

As it related to supervised visitation, Gray testified that although Jermaine was not always compliant with visitation, Noah and Chanel seemed bonded to him, and that Jermaine was attentive to their needs, provided food, and engaged in activities including reading to the children.

Additionally, according to Hough, when she was first assigned to the case, Jermaine did not participate in visits in January 2021 but participated from April through September 2021 after which Jermaine was incarcerated. Following Jermaine's release from incarceration in October, visits were restarted but were inconsistent because Jermaine failed to confirm visits and/or failed to be present at home or failed to answer the door.

Guerrero testified that he was assigned to supervise visits for Jermaine and Kelly starting in July 2020. Jermaine and Kelly had visits together until January 2021 at which time their visits were separated following Kelly's report that Jermaine had threatened her. After the parents' visits were separated, Jermaine did not respond to the visitation worker until June or July 2021. Guerrero testified that Jermaine attended about 60 percent of his visits and was discharged after multiple no-shows. According to Guerrero, Jermaine either failed to confirm visits as required or gave some excuse relating to COVID-19. Guerrero testified to one incident when Jermaine became upset after Jermaine had failed to confirm a visit on time where Jermaine

> had some profane texting that he sent out that was not like his normal character. It was very hostile . . . seemed like he was very angry. And it was different than what I expected. Normally he's very cordial, very polite. It was almost like the exact opposite of what I've ever seen or heard from him.

According to Guerrero, when Jermaine did participate in visits, he interacted well with the children. Guerrero stated that he even complimented Jermaine's playfulness, his interactions with the girls, and his tenderness. He stated, "[a]nd I almost likened him to Mister Rogers for children." The visitation worker stated that he did have concerns during the visits about domestic violence, negative training, and permissive parenting issues but no safety concerns existed which required him to intervene or end the visits.

Both foster parents testified that Jermaine would often miss visits or fail to timely confirm the visit. Both foster parents stated that they had not received gifts, clothing, cards, or money from Jermaine for the children.

(d) Best Interests

Both caseworkers testified that termination was in the minor children's best interests. Gray testified that although the children had a bond with Jermaine, his parental rights should be terminated due to Jermaine's lack of compliance with court orders including missed drug tests, Jermaine's failure to address "the reasons his kids came into care," the length of time the children had been in care, and Jermaine having "not been able to provide a safe and stable environment for his children free from drugs." Hough testified that, in her opinion, termination of Jermaine's parental rights was in the children's best interests due to his continued substance use, erratic behavior, failure to provide for the children's basic needs, and inconsistent visitation.

According to the children's foster parents, both Noah and Chanel had additional needs as a result of their exposure to methamphetamine while in Jermaine and Kelly's home. Specifically, Noah has had to receive medical care for lesions on her body from what her doctor believed was the result of the methamphetamine in her system and there was no treatment to prevent or eliminate them entirely. Chanel had behavioral difficulties and, based on recommendations from medical providers, Chanel completed an initial diagnostic interview with therapist Parks.

Parks, who provided weekly therapy for Chanel from August 2020 until August 2021, testified that she had initial concerns of developmental delays and recommended further evaluation of Chanel. Parks reported that Chanel struggled after her parents would miss visits including exhibiting behaviors such as smearing feces on the wall after getting upset, being extremely tearful and inconsolable, screaming, and having temper tantrums. Parks stated that Jermaine did not participate in Chanel's therapeutic services. Following further evaluation, Chanel was diagnosed with drug exposure; however, the evaluators were unable to definitively diagnose Chanel with fetal alcohol syndrome due to their inability to confirm with Kelly whether she had used methamphetamine while pregnant with Chanel.

### 3. JUVENILE COURT ORDER

The juvenile court found that termination of Jermaine's parental rights was supported by clear and convincing evidence under grounds set forth in § 43-292(2), (4), and (6) and that termination of Jermaine's parental rights was in the minor children's best interests. Jermaine has appealed the juvenile court's order terminating his parental rights.

## III. ASSIGNMENTS OF ERROR

Jermaine assigns that the juvenile court erred in terminating his parental rights because (1) the evidence presented by the State did not support the statutory grounds for termination and (2) termination was not in the minor children's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of LeVanta S.*, 295 Neb. 151, 887 N.W.2d 502 (2016). When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *Id*

## V. ANALYSIS

### 1. STATUTORY GROUNDS

Jermaine first asserts that the juvenile court erred in finding that the allegations contained in the motion to terminate Jermaine's parental rights under § 43-292(2), (4), and (6) were supported by clear and convincing evidence.

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases exist and that termination is in the child's best interests. § 43-292. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Section 43-292(2) provides for termination of parental rights when the parent has substantially and continuously or repeatedly neglected and refused to give the juvenile or a sibling of the juvenile necessary parental care and protection. One need not have physical possession of a child to demonstrate the existence of neglect contemplated by § 43-292(2). *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015). A parent may as surely neglect a child of whom the parent does not have possession by failing to put himself or herself in a position to acquire

possession as by not properly caring for a child of whom the parent does have possession. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). Further,

> [a] parent's failure to provide an environment to which his or her children can return can establish substantial, continual, and repeated neglect. Past neglect, along with facts relating to current family circumstances which go to best interests, are all properly considered in a parental rights termination case under § 43-292(2).

*In re Interest of Joseph S. et al.*, 291 Neb. at 961, 870 N.W.2d at 147-48.

Here, Chanel and Noah have been in foster care for much of their lives, both having been removed shortly after their births due to Jermaine's drug use and domestic violence issues. At the time of the termination hearing, Jermaine had been receiving services for about 5 years, but those services had failed to correct the reasons that led to the removal of Chanel and Noah. During the pendency of the case, Jermaine failed to complete a hair follicle test, was discharged from drug testing multiple times due to noncompliance, failed to participate in intensive outpatient treatment, and was incarcerated for a significant period of time after being convicted of possession of methamphetamine and possession of drug paraphernalia. Further, in drug tests that Jermaine did complete, the results indicated traces of methamphetamine and THC in his system and Jermaine admitted to both caseworkers that he was still using substances. The caseworkers, foster parents, and visitation worker all reported having concerns regarding domestic violence. The caseworker specifically testified that she observed bruising on Kelly which Kelly indicated was caused by Jermaine when he was attempting to grab a phone from her hand.

Additionally, throughout the history of the case, Jermaine's attendance at visitation was inconsistent; he attended only 60 percent of his visits. In fact, he would fail to confirm visits in time, miss visits, or not open the door when his children were standing outside for their visits. At one point, both Chanel and Noah were returned to Jermaine's care, but he returned Noah to the foster parent one day later and Chanel was removed from Jermaine's care after she tested positive for methamphetamine. Both children have medical needs as a result of their exposure to methamphetamine and Jermaine did not participate in medical appointments or therapy appointments for either Chanel or Noah.

Under our de novo review of the record, we find that the juvenile court did not err in finding that the evidence was sufficient to support termination under § 43-292(2) as Jermaine has failed to put himself in a position to provide care and support to his children and has failed to maintain a safe environment by correcting the substance use and domestic violence which led to Chanel and Noah's removal. Having found that termination was proper pursuant to § 43-292(2), we need not consider whether termination was proper pursuant to subsections (4) and (6). See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019) (if appellate court determines lower court correctly found termination of parental rights is appropriate under one of statutory grounds set forth in § 43-292, appellate court need not further address sufficiency of evidence to support termination under any other statutory ground).

## 2. BEST INTERESTS

Jermaine next argues that the juvenile court erred in finding that termination of his parental rights was in Chanel and Noah's best interests.

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Becka P. et al., supra*; *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015).

A parent's right to raise his or her child is constitutionally protected; so, before a court may terminate parental rights, the State must show that the parent is unfit. *In re Interest of Jahon S., supra*. There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parents. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts. *Id.*

Here, the case was originally opened in 2017 due to concerns of drug use and domestic violence. Jermaine allowed Chanel and Noah to be exposed to methamphetamine while the children were in his care, he continued to use drugs throughout the case, and he failed to enter treatment to correct his addiction. Jermaine has repeatedly failed to provide a safe, stable, and drug-free environment for his children and has placed his own desires before his children's needs. Jermaine's conduct during the pendency of the case does not reflect his concern for the best interests of Chanel or Noah. His inconsistency in participating in visitation does not demonstrate that he is motivated to reunify with Chanel and Noah. In fact, during the temporary period in which the children returned home, Jermaine continued to use substances and returned Noah to her foster parent after one day because he could not care for her. Jermaine did not enter drug treatment and had not progressed beyond supervised visitation. There is no basis in this record to conclude that reunification could be achieved in the foreseeable future. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). We hold that the juvenile court did not err in finding that termination of Jermaine's parental rights was in the best interests of Chanel and Noah.

## VI. CONCLUSION

Having found that the evidence was sufficient to support the statutory basis for termination pursuant to § 43-292(2) and that termination was in the minor children's best interests, we affirm the juvenile court's order terminating Jermaine's parental rights to Chanel and Noah.

AFFIRMED.